Is the appellant ready to proceed? You may. May it please the court, this matter originally arose from a dispute between local county election officials and a voter in a 2014 election, but now neither party is before the court. Instead, the sole remaining plaintiff is OCA-Greater Houston, an organization based in a completely different area of the state with zero connection to the original voter and who has not established a similar injury to one of its members. The court should reverse the district court's judgment for three reasons. First, OCA has not established a sufficient injury to confer organizational standing and the Secretary of State is not a proper party to the suit. Second, state law and federal law don't conflict. Third, even if the court affirms on standing and the merits, the court should still reverse the remand to narrow the injunction at issue. As an initial matter, OCA has failed to establish that it has organizational standing. The Supreme Court and this court has repeatedly held that not every expenditure of resource and not every alleged injury is sufficient to confer organizational standing. Most notably, an action that simply affects a group's abstract social interest is not enough. Instead, in Havens, the Supreme Court says to confer organizational standing based on resources expenditure, the expenditure must perceptively impair an organization's activity and be coupled with a drain of that organization's resources. This court in, in City of Kyle, in NAACP versus City of Kyle, interpreting that Havens articulated test as it must, quote, divert significant resources, unquote, to affect the group's activity. Here, in sum, OCA alleges that, alleges time its members spent conferring with, time its volunteers and employees spent discussing the state law at issue with its, with members during phone banks and in-person communications during this annual get-out-the-vote campaign. But the record established that these communications, these conversations, and this annual get-out-the-vote campaign would have happened regardless of the state law and regardless of. But Ms. Chen's deposition is the opposite. She said because of state law and the distinction under Chapter 64 and 61 between assisters and interpreters and translators and helpers under Asian languages, that takes 10 to 15 minutes more time. Well, these conversations were routine conversations that they had in all get-out-the-vote campaigns. But she specifically says more time to explain Texas's distinctions. That, that's correct, Your Honor. The difference is that time based on conversations, that would have had taken place regardless. And these conversations were. Well, you say that, but that seems to be a material issue of fact, because she's saying the opposite. She's saying it takes more resources, more time. Well, she does say that it takes more time and takes more resources, but that. That's a diversion of resources that wouldn't otherwise happen under Kyle. But the overall conversation would have happened. The overall conversation to, the phone call to the voter, the in-person conversation. And I guess counsel will understand that, but we can agree that there would have been a conversation, but the substance of that conversation changes based on this rule. Isn't that what we're talking about? The shape of that conversation. And it expands. For some of these conversations, not for all. Now, the record reflects. Airment means weakening, diminishing, and perceptible means being capable of perceived. So, Supreme Court in Havens is a pretty minimal, and let me turn that into a question. Does Texas suggest to us that Kyle adds to the injury, in fact, beyond Lou Jan? In other words, is there an additional element to what an individual would face in an organization? Is that your argument or not? Our argument would be to show a sufficient injury for an organization based on resources. The diversion has to be significant, and that's taken from Kyle. But significant, how does that harmonize with capable of being perceived? Where the Supreme Court says perceptible. Well, the Supreme Court says perceptible and also says it must be accompanied by a diversion of resources. Here, it talks about- Perceptible diversion of resources. I don't see how- Well, I think one case that's instructive to this is actually the Acorn versus Fowler case, where there, there are multiple allegations of activities that are not related to litigation that they used to, that the plaintiffs tried to assert standing on. And in particular, that was a MVRA case where there was, where the issue was there was not registration based on public assistance. And Acorn argued a couple different voter registration activities that they alleged confer standing. And I think what's instructive is the kind of activities that the Fifth Circuit held does not confer standings and the kind that it does. Now, one of the ways that they tried to argue- I read our case in Kyle with Havens to be saying no injury if legal costs, no injury if identical to what you're doing anyway. But yes injury if mission or resources diverted, increased, added. And then you have the Chen deposition, and it looks to me you're in the second box. But the Chen deposition and the allegation here, I would argue, is analogous to the allegation in Acorn that the Fifth Circuit says does not confer standing. That was a lobby legal litigation entity as well, though, right? There was three types of activities in Fowler that the plaintiffs said conferred standing. One was litigation. That was not it. One was monitoring. The Fifth Circuit looked at that and said, monitoring, you would have done that anyways. That doesn't confer standing. And then there was voter registration activity. And the Fifth Circuit said most of what they alleged did not confer standing. In particular, the Fowler plaintiffs alleged that they participated, they sent voter applications out to its members and attended housing fairs where they registered members to vote. And part of that alleged injury there in attending the housing fairs and sending those applications out was that there are voters who are not registered to vote, but for Louisiana's failure to implement the MVRA. Therefore, at these housing fairs, we have to expend resources and time to register those voters that we otherwise would not have to expend. We would argue that's analogous to the situation here. And what the Fifth Circuit said in that case is because you were already doing that, you cannot show that you would have reallocated those resources any differently. Even though there were some, the argument was there were some voters that they had to register during those housing fairs that otherwise would not have been registered. We would analogize that to the situation here. Yes, the shape of those conversations have changed, but those conversations would have happened regardless. They were part of the routine activities that annually happen put on by OCA. And I think the record reflects that those conversations would have happened regardless. Now, the shape of them would have changed, but just the time. And that's different than the situation in Fowler where they did, where the Fifth Circuit did say that some types of voter registration activities confer standing. And that was specific to new voter registration drive held specifically for voters who were not registered in welfare, welfare recipients and votings that were not registered based on Louisiana's failure to implement the MVRA. That's a new, that's a new activity. That's not the case here. And we would also distinguish that from Scott v. Schindler, which plaintiffs also rely on. Again, that was a new activity that was not part of the routine activity that would not have occurred regardless. That the plaintiffs in that case took directly in response to Louisiana's failure to implement the MVRA. So we would say that actually supports the situation here where the get out to vote conversations that, you know, pertain to a lot of material that's completely unrelated to the issues here. They relate to logistics such as this is your voting locations, this is your time to vote. They also relate to, they also contain education that's not directly related to the laws at issue here. This is a voter ID law you need to bring, et cetera. So merely pointing to a little bit more time there, we would argue is consistent with the court's holding in Fowler that that is not enough to confer standing. And here, the plaintiffs first argue that they don't need to show a diversion of resources. But again, we would say that conflicts with the court's, the court's analysis in City of Kyle and also the court's analysis in- from the standing issue from the premise that litigation expense cannot create the injury. And obviously, that's essential, that principle is required. Now, then you move from that to a company that is a lobbying firm, and that's what they do. I mean, that's a good business, and they do it, but that is their business. So they have a real difficulty in trying to set out expenses, injury, because they, for which they're now suing, when that's really part of their business. Now, so when we move to a company that's not in that business, then you're still asking the same question about injury. But you can, frankly, on its face, more easily show that the extra time and devotion is not wrapped up in litigation itself, because that's not your business. And so, and on that measure, it takes, as I read the precedent, some say the word trifle. It takes very little, as my colleague pointed out. Do you agree with those distinctions? I generally do, but I would distinguish it from the situation here, because the record reflects that OCA, as part of their routine business, runs an annual get out the vote campaign that includes phone banks, that includes in-person conversation, and that is part of, that is part of their mission. It is not all that they do, but that is certainly part of their mission, and what the record reflects is that happens annually, and that would happen regardless of. You're saying there really are, in the lobbying business? Not necessarily in the lobbying business, but in the. Get out the vote, you know, is pushing, I presume the voters are going to affect the policy. The lobbyists are going past the voters. But I think the record here reflects that these conversations with the voters, that they're claiming confer standing, again, would have happened regardless. Now the shape of them, they may be, on occasion, longer, but the content, they provide education to, about what the law is, about where to vote, encouraging them to vote, would all be the same, it's just for some of them, it would be a little bit shorter. And what concrete evidence we have towards the drain of resources indicates that the OCA has a budget of $140,000 a year, $20,000 of that is dedicated to the get out the vote campaign. The evidence in the record reflects that they have never exhausted that $20,000 budget. They have never had to put another project outside of that on hold, or no project outside was impacted based on these time constraints. And finally, I would say that, as a practical matter, allowing an organization to obtain standing simply by length of time it has in conversations with its members would, in practice, allow, would effectively eviscerate the holding that an organization cannot simply obtain standing by a setback to its abstract interest. Because all an organization would have to do would tell its members to talk a little bit more about the issue with its constituents. And I'd like to kind of quickly pivot to the injunction, because even if the Court affirms on standing and on the merits, the injunction here is overly broad. Now, there's two orders related to the injunction. First, what's the essence of your merits argument? As far as the merits, the plaintiffs allege in their Texas law, there's two provisions here. Chapter 64 We know all the law. What's your merits argument? Why are they identical? Chapter 64 tracks 208. Plaintiffs allege that in their complaint, that they substantially track each other. And we read both 208 and 64 as applying both in the ballot box. Plaintiffs in this case didn't seek injunctive relief or declaratory relief saying 64 is invalid. And, in fact, they say it substantially tracks 208. We agree with that, Your Honor. So Texas law provides that any assister consistent with 208 can come inside the ballot box to help translate, to help assist in any English-impaired voters. But an assister can't help with the voting process up into the ballot box under Texas law? That's how we interpret Texas law. And we interpret 208 as also applying only inside the ballot box. But the VRA defines any, what is the definition? All action necessary to make a vote effective? At any point during the voting process. Our position is that that contains outside the ballot box. But even if the court affirms on the merits, the injunction contains a catch-all provision, both in the original injunction and a supplemental injunction that generally hold that it enjoins the state from taking any action that conflicts with any part of the Voting Rights Act, not even narrow to QOA and not even narrow to the EASA. Any conduct necessary to effectuate the voting? Well, in Scott's, in Scott's, right. You can, you can, consistent with that, say only in the, only in the ballot box itself. I mean, the voting booth itself. I understand, Your Honor. But even if the court kind of finds against. Do you have an answer to that? I mean, is there? Our answer to that is that we believe that 64 tracks as plain language as 208. But to the extent that we are wrong about that, the injunction still here is overly broad. Because it. The extent that you, the extent that, that's correct that there's no standing. But that obviously doesn't affect standing and then obviously. I understand you're pushing standing. But I do have a difficulty with your merits argument. That may be why we're talking about standing so much. I understand, Your Honor. But even in the event that they find that the court affirms on standing and the merits, we'd ask that the remand to narrow the scope of the injunction. And I'll reserve the rest of my time for rebuttal. Thank you, Counsel. Apelli. May it please the court. David Hoffman on behalf of the Apelli OCA Greater Houston. We believe that the trial court in this case did a thorough analysis of the standing rules that apply both in the Supreme Court and in the circuit and properly concluded that there is organizational standing. I'd like to start with really though I think is the major point that the state was making. That there's a requirement for a new activity. That requirement isn't seen anywhere in the case law. As was noted during his argument, the standard here is perceptible impairment. And perceptible impairment happens if your goals, what you're trying to achieve as an organization, are impaired and that can be perceived. And we see it perceived because the district court held a factual hearing. We listened to witnesses, examined documents, and- Were there witnesses? There was one witness, excuse me, one witness, Your Honor. And the documents, and perceived it, noted it. There's two pages in the decision addressing what the impairment was. Obviously, it's perceived. That impairment- I want to hear your whole argument, but in Kyle, did we use the adjective significant? Implying something more than perceptible, trifle, has to be a higher amount? That adjective is used, although I would believe that that adjective is meant to be in concert with the remainder of the law. That it can be a qualitative, not quantitative. There has to be an impairment. I mean, again, City of Kyle uses the standard, which is perceptible impairment. And if you're going to, you have to interpret the use of that word significant in concert with City of Kyle. I mean, excuse me, in concert with the perceptible impairment requirement. So I believe if you can perceive it, the Fifth Circuit case law provides, that's a sufficient impairment, as long as it's not- It's not identical to what you're doing already. It's not identical, Your Honor, I think that's the important part. I know, but that would be the exception. That would be the exception. And we see that in Fowler. That the reason, there's those three buckets that were addressed in Fowler, obviously litigation, monitoring, and then there was the third bucket. And the reason the third bucket didn't satisfy standing was that there was no evidence presented. And this was, that case was at summary judgment. There was no evidence that the court saw that they had done anything different. That there was any perceivable extra time required. They merely did what they already did. But even given that, the court in Fowler still remanded the case back so that the plaintiff could potentially establish standing and show that they had used some extra time. Here, we've been all the way through it. We've had factual findings. And the, again, three times as long to talk to a limited English proficiency voter. That's a finding of fact by the district court. The district court also found that they have a goal of being able to reach out to 9,000 voters. And as a factual matter, OCA Greater Houston is unable to achieve its goal. It never gets to that goal. And that's directly attributable to the fact that it takes longer time because of the effects of the law to talk to each limited English proficiency voter. Again, because of the effects of the law. And just going back, nowhere in this case law is there any requirement that you have a new event. But even if you sort of would wrap yourself around that construct, I think there is something new going on here. And that's every conversation has a new component, which is you have to spend this extra time focused just on how do you deal with the effects of this law. The other argument was, I'll hit quit very briefly, is just the VRA and the definition of voting is clear. I think the government's amici makes that very clear. There is no basis to conclude that the provisions are ballot box specific. But just more broadly, having one provision that follows the VRA and one that doesn't, doesn't make the one that doesn't follow the VRA acceptable. How many gaps do you see existing when you try to put the two on top of each other? The main gap we see is that the interpreter provision puts restrictions on an interpreter that are not required by the VRA. There's another gap, again, which the state points out, that the way they interpret the assister provision, it is interpreted too narrowly to only apply to the ballot box. So we believe that there's those two separate gaps, although the basis for the suit here is more focused on the interpreter provision and the fact that the interpreter provision, as enforced by the state under 31003, which requires them to provide guidance to the counties and to, in particular, excuse me, 3103 requires Secretary of State shall obtain and maintain uniformity in application, operation, and interpretation of this code and election laws outside this code. So they have a mandatory obligation and the interpreter provision rules that they put out and enforce specifically would exclude interpreters that otherwise qualify under the VRA. An interpreter both has to have the same resident, county residence? An interpreter under the law has to be a registered voter in the county. Plus can only help if the official can't interpret or wrong. I don't believe that's the case, Your Honor. It's just the requirement that they be a registered voter in the same county. And just, again, this came up during the testimony to give you an idea practically why this isn't an issue oftentimes. Is typically limited, limited English proficiency voters are older and they will often bring their grandchildren with them because their grandchildren obviously go to school and speak fluent English. But a 15 year old boy or girl can't be a registered voter in the county because they can't vote, obviously. But they certainly qualify as an assister under the VRA. Can't help grandmother. I'm sorry, Your Honor? Grandmothers need help sometimes. They definitely do sometimes. And then as to the final point that the state raised, we believe certainly the injunction could provide more detail. But it is not simply a blanket don't break the law. The judge identified a very specific provision of the voting rights act, I mean, I'm sorry, of the state law and instructed the state not to enforce it. And if there's any doubt, I think we can practically see that the state's already implemented the injunction. There hasn't been any disputes over its scope as to date, so I believe that it's fairly clear to the parties exactly what needs to be done. And that's the last thing I have, Your Honors, unless there are further questions. Thank you, Counsel. Thank you. Rebuttal. I want to focus my last five minutes on the scope of the injunction because we argue that it's both vague and overly broad. And I think what's important to note here is that in Texas, local officials actually are the ones who administer the elections and the ones who on the ground interpret these provisions. Now, none of the Harris County local elections officials that would be relevant to the members of OCA were party to this suit. Secretary of State is not a sufficient defendant in the injunction. And joining the Secretary of State is not sufficient here? Well, the problem goes to the vagueness, what we argue is the vagueness of the injunction, because it's an ordinary person standard. Can an ordinary person read the injunction and figure out what's enjoined and what's not? And as a matter of, as a practical matter, that's particularly important here because the local officials who actually administer the elections and are covered by this injunction, even though they weren't a party to the suit, are not necessarily lawyers. They're not necessarily legal experts. In many cases, they're volunteers by these, by, in these communities. And they're covered and bound by this injunction that, that broadly has catch-all provisions that say any, we, we enjoin any, any action that- Well, can't the Secretary of State issue any compliance with the injunction, give instructions to the locals? We have- That's what they do. We do give guidance to the locals. And we have here, but, but there's little we can do to actually enforce our guidance. And in any event, those local officials would be bound by the injunctions, whether we give guidance or not. And here we have catch-all- There's little you can do. Well, there's no more or less than you can do with any other voting situation, is there, as Secretary of State? That's correct. There are some matters, particularly like, I distinguish this from the VC case, the voter ID case, where there's an affirmative, there's an affirmative duty in, in the statute that allows the Secretary of State to take action. Here, generally, we could give guidance, but there's little we can do to actually compel local officials to comply with the law. In any event, the general catch-all provisions here are, I, I argue, are particularly problematic, because they're both vague and they're both, and, and also overly broad in that they prohibit and enjoin the, the state and local officials from doing any action that violates any provision of the election law. That's, first, a catch-all provision that Scott says is, is overly broad and, and second, or is vague. And second, it goes outside the scope of what was argued in this lawsuit or contested in this lawsuit. And, and in that regard, we'd argue, and Scott and other cases in the Fifth Circuit have said that the law should be narrowed. It should be narrowed to specifically, to first, to take all the catch-all, take out the catch-all provisions and vacate the catch-all provisions that say we enjoin any action that violates any, any provision of 208 or the Voting Rights Act. Second, it should narrowly be tailored to the issues here, Chapter 61 and 64 and 208, and describe in specific detail what is actually enjoined here. And with that, Your Honor, unless there's further questions, we'd ask that the Court reverse and remand, or the alternative to reverse and render, or the alternative to reverse and remand to narrow the scope of the injunction. Thank you, Counsel.